**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| **CELLTRACE LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **No. 6:09cv294 LED-JDL** |
| | § | |
| **AT&T INC., et al,** | § | **JURY DEMANDED** |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM OPINION AND ORDER

This claim construction opinion construes the disputed claim terms in U.S. Patent Nos.

6,011,976 ("the '976 patent") and 7,551,933 ("the '933 patent"), asserted by Plaintiff Celltrace LLC

("Celltrace"). Celltrace alleges AT&T Mobility, f/k/a Cingular Wireless LLC, T-Mobile USA, Inc.,

Alltel Corporation, Alltel Communications, LLC, and Cellco Partnership d/b/a Verizon Wireless[1]

(collectively, "Defendants") infringe the '976 and '933 patents.[2] The parties have presented their

claim construction positions (Doc. Nos. 206, 218, & 222). On November 2, 2010, the Court held

a claim construction hearing and heard argument. The Court issued a provisional claim construction

order on November 8, 2010 (Doc. No. 234). For the reasons stated herein, the Court adopts the

constructions set forth below.

---

[1] Some of the originally named defendants have been dismissed: AT&T Inc. (Doc. No. 216), ETEX Communications, L.P., ETEX Telephone Cooperative, MetroPCS Communications, Inc. (Doc. No. 52), MetroPCS Wireless, Inc. (Doc. No. 52), Sprint Nextel Corporation (Doc. No. 217), Sprint Spectrum L.P. (Doc. No. 217), Sprint Communications Company L.P. (Doc. No. 217), Nextel Operations, Inc. (Doc. No. 217), Nextel West Corp. (Doc. No. 217), Nextel of California, Inc. (Doc. No. 217), Nextel Communications of the Mid-Atlantic, Inc. (Doc. No. 217), Nextel of New York, Inc. Doc. No. 217), Nextel South Corp. (Doc. No. 217), Nextel of Texas, Inc. (Doc. No. 217), and United States Cellular Corporation (Doc. No. 212).

[2] Celltrace alleges Defendants AT&T Mobility and T-Mobile infringe Claims 2-5, 10-14, and 16-18 of the '976 patent, as well as Claims 1-14 and 16-20 of the '933 patent. The remaining defendants are accused of infringing only Claims 17-20 of the '933 patent. (Doc. No. 220 at 2, n.2).

## OVERVIEW OF THE PATENTS

**I.      The '933 Patent**

The '933 patent is directed to a cellular telephone-based telecommunications system capable of broadcasting messages to one or more cellular phones using a short message service. '933 patent at 1:18-21; 1:41-45; 3:6-9. Broadcasted messages may be text messages for display on a cell phone or messages issuing commands or instructions. '933 patent at 6:48-64. Such command messages may include "instructions to lock and/or unlock" a memory location within the cell phone, or reading or writing data on a Subscriber Identity Module ("SIM card"). '933 patent at 2:11-12; 7:10-14 (Claim 5); 7:15-17 (Claim 6). The cell phones operating on the claimed system, which contain processors capable of distinguishing between the types of messages sent (text or command), preferably contain SIM cards that are able to decode command messages. '933 patent at 7:37-40, 7:47-49.

In addition, the '933 patent discloses a particular global telecommunications system, the Global System for Mobile Communications ("GSM"), that uses a GSM type of short messaging service, the Short Message Service ("SMS"), to deliver text or command messages, as is illustrated in Figure 1 to the right. '933 patent at 3:6-47; FIG. 1.

The operation of the SIM card is illustrated in Figure 5 below.



Fig.1.



Fig.5.

Fig.5(contd.)

'933 patent at 5:22-23; FIG. 5.

Claims 1 and 17 of the '933 patent are set forth below as representative claims with disputed claim terms set forth in bold:

> 1. A method of communicating between a remote station and a **GSM-compatible cellular telephone** capable of two-way voice communication comprising:
>
> **selectively transmitting from the remote station to the cellular telephone an SMS text message containing text**;
>
> **selectively transmitting from the remote station to the cellular telephone an SMS write command message containing a write command and associated write data**, the cellular telephone including a removably coupled SIM card;
>
> the cellular telephone detecting an incoming communication as an incoming **SMS write command message** or an incoming **SMS text message**; and
>
> in the event the incoming communication is an SMS text message, displaying at least a portion of the text contained in the incoming SMS text message on a display associated with the cellular telephone; and
>
> in the event the incoming communication is an SMS write

command message, the **SIM card** decoding the write command contained in the SMS write command message.

'933 patent at 6:44-64 (Claim 1).

17. A telecommunications network for communicating with a plurality of cellular telephones, comprising:

a cellular telephone capable of two-way voice communication; and

**at least one remote station which selectively transmits to the cellular telephone a message of a first message type or a second message type**, wherein **the first message type is formatted to contain text to be displayed on a display of the cellular telephone and the second message type is formatted to contain a command and data associated with the command**, wherein the command indicates to the cellular telephone to execute at least one instruction for performing an operation other than to support the displaying of text;

wherein **the cellular telephone distinguishes the message as being of either the first message type or the second message type**, and, if the message is of the first message type, displaying at least a portion of the text on the display of the cellular telephone,

and automatically, if the message is of the second message type, executing the at least one instruction;

wherein the message is wirelessly carried from the remote station to the cellular telephone using a common **short message service protocol** over a common **short message service channel**, regardless of whether the message is of the first or the second message type;

wherein the remote station is configured to transmit messages of the first and the second message types, and **the cellular telephone is configured to receive and process messages of the first and the second message types**; and

wherein **remotely located information is downloaded** to the cellular telephone.

'933 patent at 8:22-54 (Claim 17).

## II.    The '976 Patent

Plaintiff asserts only Claim 2 and its dependant claims against Defendants.  (Doc. No. 220) at 2, n.2.

Claim 2 of the '976 patent concerns a telecommunications system comprising a host station and multiple subscriber units. '976 patent at 7:4-5. The host station is able to transmit messages of either a first type or a second type to the subscriber units. '976 patent at 7:7-11. Messages of the second type are messages that have "a data stream including an embedded command." '976 patent at 7:11-13. The subscriber units are able to detect incoming messages of either the first or second types, but have the capability to distinguish between them, displaying messages of the first type, and decoding commands embedded in messages of the second type. '976 patent at 7:10-27. Additionally, the subscriber units execute an operation in accordance with the decoded command. '976 patent at 7:27-30.

## CLAIM CONSTRUCTION PRINCIPLES

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). The Court examines a patent's intrinsic evidence to define the patented invention's scope. *Id.* at 1313-1314; *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). Intrinsic evidence includes the claims, the rest of the specification and the prosecution history. *Phillips*, 415 F.3d at 1312-13; *Bell Atl. Network Servs.*, 262 F.3d at 1267. The Court gives claim terms their ordinary and customary meaning as understood by one of ordinary skill in the art at the time of the invention. *Phillips*, 415 F.3d at 1312-13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

Claim language guides the Court's construction of claim terms. *Phillips*, 415 F.3d at 1314. "[T]he context in which a term is used in the asserted claim can be highly instructive." *Id.* Other

claims, asserted and unasserted, can provide additional instruction because "terms are normally used consistently throughout the patent." *Id.* Differences among claims, such as additional limitations in dependent claims, can provide further guidance. *Id.*

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex. Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). In the specification, a patentee may define his own terms, give a claim term a different meaning that it would otherwise possess, or disclaim or disavow some claim scope. *Phillips*, 415 F.3d at 1316. Although the Court generally presumes terms possess their ordinary meaning, this presumption can be overcome by statements of clear disclaimer. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343-44 (Fed. Cir. 2001). This presumption does not arise when the patentee acts as his own lexicographer. *See Irdeto Access, Inc. v. EchoStar Satellite Corp.*, 383 F.3d 1295, 1301 (Fed. Cir. 2004).

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. For example, "[a] claim interpretation that excludes a preferred embodiment from the scope of the claim 'is rarely, if ever, correct." *Globetrotter Software, Inc. v. Elam Computer Group Inc.*, 362 F.3d 1367, 1381 (Fed. Cir. 2004) (quoting *Vitronics Corp.*, 90 F.3d at 1583). But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and

examples appearing in the specification will not generally be read into the claims." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988); *see also Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patentee may define a term during prosecution of the patent. *Home Diagnostics Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent"). The well established doctrine of prosecution disclaimer "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). The prosecution history must show that the patentee clearly and unambiguously disclaimed or disavowed the proposed interpretation during prosecution to obtain claim allowance. *Middleton Inc. v. 3M Co.*, 311 F.3d 1384, 1388 (Fed. Cir. 2002). "Indeed, by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover." *Spectrum Int'l v. Sterilite Corp.*, 164 F.3d 1372, 1378-79 (Fed. Cir. 1988) (quotation omitted). "As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution." *Omega Eng'g, Inc.*, 334 F.3d at 1324.

Although, "less significant than the intrinsic record in determining the legally operative meaning of claim language," the Court may rely on extrinsic evidence to "shed useful light on the relevant art." *Phillips*, 415 F.3d at 1317 (quotation omitted). Technical dictionaries and treatises may help the Court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but such sources may also provide overly broad definitions or may not be

indicative of how terms are used in the patent. *Id.* at 1318. Similarly, expert testimony may aid the Court in determining the particular meaning of a term in the pertinent field, but "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful." *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

The patent in suit may contain means-plus-function limitations that require construction. Where a claim limitation is expressed in means-plus-function language and does not recite definite structure in support of its function, the limitation is subject to 35 U.S.C. § 112 ¶ 6. *Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). In relevant part, § 112 mandates that "such a claim limitation be construed to cover the corresponding structure . . . described in the specification and equivalents thereof." *Id.* (citing 35 U.S.C. § 112 ¶ 6. ). Accordingly, when faced with means-plus-function limitations, courts "must turn to the written description of the patent to find the structure that corresponds to the means recited in the [limitations]." *Id.*

Construing a means-plus-function limitation involves two inquiries. The first step requires "a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). Once a court has determined the limitation's function, "the next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Medtronic*, 248 F.3d at 1311. A structure is corresponding "only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id*. Moreover, the focus of the corresponding structure inquiry is not merely whether a structure is capable of performing the recited function, but rather whether the corresponding structure is "clearly linked or associated with the [recited] function." *Id*.

# DISCUSSION

The terms in dispute, and their corresponding constructions, are set forth below.

## I.     "selectively transmitting" Terms

| Term # | Claim Term or Phrase | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| 15 | selectively transmitting from the remote station to the cellular telephone an SMS text message containing text[3] | Transmitting an [SMS text message] from the [remote station] to a particular [cellular telephone]. | selecting a message as being an [SMS text message] containing text and then transmitting the message from the [remote station] to the [cellular telephone]; |
| 16 | selectively transmitting from the remote station to the cellular telephone an SMS write command message containing a write command and associated write data[4] | Transmitting an [SMS write command message] and data to be written into a memory of the [cellular telephone], from the [remote station] to a particular [cellular telephone]. | selecting a message as being an [SMS write command message] containing a write command and associated write data and then transmitting the message from the [remote station] to the [cellular telephone] |

---

[3] This term is contained in Claim 1 of the '933 patent.

[4] This term is contained in Claim 1 of the '933 patent.

| 17 | at least one host station which selectively transmits an SMS text message containing text, or an SMS write command message containing a write command and associated write data, to the at least one cellular telephone[5] | At least one [host station] transmits an [SMS text message] or an [SMS write command message] and data to be written into a memory of the [cellular telephone], to a particular [cellular telephone]. | at least one [host station] which selects a message as being an [SMS text message] containing text, or an [SMS write command message] containing a write command and associated write data, and then transmits the message to the at least one [cellular telephone] |
|---|---|---|---|
| 18 | at least one remote station which selectively transmits to the cellular telephone a message of a first message type or second message type[6] | At least one [remote station] transmits a message of a first or second type to a particular [cellular telephone]. | at least one [remote station] which selects a message as being of a first message type or a second message type and then transmits the message to the [cellular telephone] |

The parties dispute what "selectively transmitting" means. Celltrace argues that "selectively transmitting" refers to transmitting a message to a particular phone. PLTFF'S BRIEF AT 17. Celltrace points to the specification in support of its construction: "According to its delivery address, the message is delivered to any or all of the other switches within that network, or even across networks. . . . A selected mobile 6 receiving the message transmits a confirmation of receipt back to its

---

[5] This term is contained in Claim 9 of the '933 patent.

[6] This term is contained in Claim 17 of the '933 patent.

respective cellsite 5." *Id.* (citing '933 patent at 3:19-22; 32-33) (emphasis in original).

Defendants, on the other hand, contend that "selectively transmitting" means selecting a particular message and then transmitting it. DFTS' RESPONSE AT 9. Looking at Claim 9, Defendants assert that the claim explicitly states that a message type, not a particular phone, is what is selected: "selectively transmits *an SMS text message containing text, or an SMS write command message containing a write command* and associated write data, to the at least one cellular telephone." *Id.* (citing '933 patent at 7:33-36) (emphasis in original). Defendants further argue that Celltrace's construction reads out an embodiment of the invention, particularly the ability for a cellsite to broadcast to a *group* of phones. *Id.* at 11.

 The claimed invention transmits messages to a particular cellular phone. The type of message is merely indicated in the claims. The portions of the specification cited by Celltrace clearly show that which is selected is a mobile phone. *See, e.g.*, '933 patent at 3:32-33 ("A <u>selected</u> mobile 6 receiving the message"). Moreover, the language of the specification indicates that the type of message is delivered "*according to its delivery address*." '933 patent at 3:20-23 (emphasis added). Therefore, messages are selectively transmitted to a particular telephone, as opposed to selectively transmitting particular types of messages.

In addition, this construction does not read out an embodiment that allows for transmission to a group of phones receiving a message. Although the message is selectively transmitted to a particular phone, the construction does not eliminate the possibility of transmitting a message to a number of selected phones according to each phone's particular delivery address.

Therefore, the Court construes the term "selectively transmitting from the remote station to the cellular telephone an SMS text message containing text," as "transmitting an SMS text message

from the remote station to a particular cellular telephone."

In addition, the proper construction of the term "selectively transmitting from the remote station to the cellular telephone an SMS write command containing a write command and associated write data" is "transmitting an SMS write command message and data to be written into a memory of the cellular telephone, from the remote station to a particular cellular telephone."

The Court construes the term "at least one host station which selectively transmits an SMS text message containing text, or an SMS write command and associated write data, to the at least one cellular telephone" as "at least one host station transmits an SMS text message or an SMS write command message and data to be written into a memory of the cellular telephone, to a particular cellular telephone."

Finally, the Court finds the term "at least one remote station which selectively transmits to the cellular telephone a message of a first message type or a second message type" means "at least one remote station transmits a message of a first or second type to a particular cellular telephone."

## II.      "host station"[7] and "remote station"[8]

| Term # | Claim Term or Phrase | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|--------|---------------------|-----------------------------------|-----------------------------------|
| 23 | host station | A computerized device that codes messages. | An operator terminal, linked to a network by a modem, that originates one or more messages sent to one or more [cellular telephones] |

---

[7] This term is contained in Claims 9 and 16 of the '933 patent and Claims 2 and 4 of the '976 patent.

[8] This term is contained in Claims 1 and 17 of the '933 patent.

| 24 | remote station | A base station coupled to a switch. | An operator terminal, at a distant location from and linked to a network by a modem, that originates one or more messages sent to one or more [cellular telephones] |
|---|---|---|---|

The parties dispute a number of issues. First, Defendants argue that a host station and remote station are similar, if not identical, because the claims use the terms almost interchangeably. DFTS' RESPONSE AT 4-5. Celltrace contends the terms mean different things because the patentees chose to use different terms. PLTFF'S REPLY AT 1-2. According to Celltrace, "different terms have different meanings." *Id.* at 2 (citing *Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1289 (Fed. Cir. 2008)).

Second, Defendants contend that the '933 patent prosecution history shows that the patentee referred to a host station as an "operator terminal, linked to a network by a modem." DFTS' RESPONSE AT 5-6. In particular, Defendants point to "terminal 1" in Figure 1, stating that terminal 1 is an operator terminal that corresponds to the "host terminal (1)" indicated in the prosecution history. *Id.* at 5. Celltrace, however, argues that a host station linked to a modem is merely one embodiment of the '933 invention. PLTFF'S BRIEF AT 23. Celltrace further argues that by defining the host station as an operator terminal, Defendants' construction inappropriately adds a functional limitation not required by the claims. According to Celltrace, a host station is merely a device capable of transmitting data; there is no indication that the host station is also required to receive data input by a user. *Id.* at 24. Moreover, Celltrace contends the specification does not modify "terminal 1" with the word "operator," nor does the '933 patent claim how messages are entered into terminal 1. PLTFF'S REPLY AT 1-2.

As for "remote station," Celltrace contends that the remote station is the hardware that transmits messages to the intended recipients. PLTFF'S BRIEF AT 24-25. Relying on the specification, Celltrace argues that the base station, in combination with the switches, are responsible for conveying the messages to each phone based on each delivery address. *Id.* at 25. Thus, Celltrace contends, a remote station is a base station coupled to a switch. *Id.* at 24. In response, Defendants reiterate the arguments made for "host station." [9] *See* DFTS' RESPONSE AT 4-8.

**A.      "remote station"**

The claims and specification support Celltrace's construction for "remote station." Claim 1 states, in relevant part, "selectively transmitting from the remote station to the cellular telephone an SMS text message containing text." '933 patent at 6:47-48. Claim 17 recites, in part, that "the message is wirelessly carried from the remote station to the cellular telephone." '933 patent at 8:44-45. Thus, the function of the remote station is to wirelessly broadcast messages to a particular telephone.

The parties seem to dispute the hardware components that perform the function of the remote station. The '933 patent discloses a method where SMS messages are broadcast from the remote station to the cellular telephone via the switches and cellsites located within the network:

> According to its delivery address, the message is delivered to any or all of the other switches within that network, or even across networks. *The switch 4, which in this example is in the geographical area to which the message is to be transmitted, delivers the message to a number of cellsites 5. The cellsites 5 are the base transceiver stations* of the GSM network. *Each cellsite 5 then broadcasts the message to a group of transceivers or mobile telephones*, hereinafter referred to as "mobiles".

---

[9] Defendants briefed the terms "host station" and "remote station" together because they contend the terms are interchangeable. *See* DFTS' RESPONSE AT 4.

'933 patent at 3:20-29 (emphasis added); *see also* Fig. 1. The specification discloses that switches and cellsites are the components that perform the function delegated to the remote station. The message is transmitted to the switches within the network, which then transfer the message to the cellsites, otherwise known as the base transceiver stations. Carrying the messages via the switches and base transceiver stations are the only wireless methods disclosed within the specification. Thus, a "remote station" is "a base station coupled to a switch."

### B. "host station"

Although the Court is to assume that the host station and remote station have different meanings, the claims support Defendants' assertion that a host station performs the same function as a remote station. *See Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1289 (Fed. Cir. 2008). Comparing Claim 9 with Claim 17, the host station and remote station both selectively transmit a message to a cellular telephone. Claim 9 states, in relevant part:

> at least one *host station* which selectively transmits an SMS text message containing text, or an SMS write command message containing a write command and associated write data, to the at least one cellular telephone.

'933 patent at 7:33-36 (emphasis added). Similarly, Claim 17 recites a remote station that broadcasts messages to mobile telephones:

> at least one *remote station* which selectively transmits to the cellular telephone a message of a first message type or a second message type.

'933 patent at 8:26-28 (emphasis added). Even though "remote station" and "host station" are presumed to have different meanings, each is used to describe components that perform the same function. Both the host station and remote station are capable of transmitting messages of a first message type, for example, an SMS text message, and a second message type, *e.g.*, an SMS write

command message to a mobile telephone. *See* '933 patent at 8:28-32 ("the first message type is formatted to contain text to be displayed . . . the second message type is formatted to contain a command and data associated with the command). Therefore, it is reasonable to conclude that the assumption that the two terms have different meanings has been sufficiently rebutted.

Moreover, the specification describes only one way of broadcasting messages to cellular phones, which is the task performed by the host station. As stated above in Section II.A, the switch delivers the message to the cellsites, a.k.a. the base transceiver stations, which then broadcast the message to a group of cellular phones. *See also* '933 patent at 3:20-29. Because both the "remote station" and the "host station" are used to transmit messages to cellular phones, the Court finds that the two terms are interchangeable. Thus, a "host station" is also a "a base station coupled to a switch."

To address Defendants' contention that the host station and remote station are operator terminals, the Court looks to the preamble of Claim 9, which states:

> A GSM-compatible telecommunications network for communicating with a plurality of cellular telephones, comprising . . . at least one host station.

'933 patent at 28-33. The preamble limits the disclosed components to a GSM network. Thus, the host station must be part of the network, rather than isolated outside the network and connected via a modem. "Terminal 1," on the other hand, seems to be located outside the network, linked to "a modem 2 and a fixed line 3 [that are connected] to a local GSM switch 4." '933 patent at 3:19. In addition, the GSM switch in Figure 1 is located within a box labeled "Inter-Network Link," indicating that the switches begin the network. *See* Fig. 1. Moreover, the specification does not equate a host station to "terminal 1," as Defendants contend. Nor does the specification describe

more than one terminal; if the host station were an operator terminal, then the specification would presumably disclose "at least one operator terminal," just as the claims indicate "at least one host station."  Instead, the specification describes "a number of cellsites 5.  The cellsites 5 are the base transceiver stations of the GSM network."  '933 patent at 3:25-26.

Accordingly, the Court construes "host station" and "remote station" to both mean "a base station coupled to a switch."

### III. "SMS write command message"[10] and "SMS text message"[11]

| Term # | Claim Term or Phrase | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| 13 | SMS write command message | *Plaintiff does not believe that a specific construction is necessary. However, to the extent the Court determines that a specific construction is warranted, Plaintiff proposes:* An [SMS] message that contains a write command. | an [SMS] message in a format particular to write commands |
| 14 | SMS text message | *Plaintiff does not believe that a specific construction is necessary. However, to the extent the Court determines that a specific construction is warranted, Plaintiff proposes:* An [SMS] message that contains text for display. | an [SMS] message in a format particular to text |

The primary dispute between the parties is whether "SMS write command message" and "SMS text message" need to be defined in terms of specific formats.  Defendants argue that the '933

---

[10] This term is contained in Claims 1, 2, and 12 of the '933 patent.

[11] This term is contained in Claims 1 and 9 in the '933 patent.

patent claims both a "type of message and the type of content within the message." Dfts' Response at 13.  Therefore, Defendants contend, the format, not content, of the two types of messages must be the feature distinguishing the two types of messages claimed in the '933 patent.  *Id.*  According to Defendants, to hold otherwise would render the formatting requirements expressed in the claims meaningless.  *Id.*

Celltrace, on the other hand, replies that these terms need no construction.  Pltff's Brief at 15-16.  However, if the terms needed to be construed, Celltrace argues the plain claim language should prevail.  *Id.*  Celltrace further contends that Defendants' constructions are inappropriate because they impose format requirements that are not disclosed by the '933 patent.  *Id.* at 15. Celltrace asserts that Defendants' constructions read out a preferred embodiment where an SMS message is of a single format and the message content is analyzed to determine whether the message is a write command message with an Embedded Command Stream ("ECS").  *Id.* at 16.

The Court finds that no construction is necessary for the terms "SMS write command message" and "SMS text message."  The claims merely recite the content of the message to correspond to the type of message specified, thus distinguishing the different message types by message content rather than message format.

**IV.**     **"a message of a first message type or a second message type"[12]**

| Term # | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | | |

---

[12] This term is contained in Claim 17 of the '933 patent.

| 3 | *Plaintiff does not believe that a specific construction is necessary. However, to the Court determines that a specific construction is warranted, Plaintiff proposes*: The first message type is formatted to contain text that is to be displayed on the [cellular phone's] display and the second message type is formatted to contain a command and data. | an [SMS] message in a first format or, alternatively, in a second format different from the first format |

At the November 2, 2010 claim construction hearing, the parties agreed that the format of the first message type differs from the format of the second message type. Therefore the Court construes the term "a message of a first message type or a second message type" to mean "a message of a first message type or a second message type, where the first message type is in a format different than the second message type."[13]

## V. "the first message type is formatted to contain text to be displayed on a display of the cellular telephone and the second message type is formatted to contain a command and data associated with the command"[14]

| Term # | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| 21 | The first message type is formatted to contain text that is to be displayed on the [cellular phone's] display and the second message type is formatted to contain a command and data specific to the command. | the first message type is formatted to contain text to be displayed on a display of the [cellular telephone] and the second message type is formatted to contain a command and data associated with the command |

The parties' primary dispute concerns the interpretation of "associated with." Celltrace

---

[13] Plaintiff proffered this construction at the hearing on November 2, 2010. *See* CELLTRACE'S MARKMAN PRESENTATION AT SLIDE 52-53.

[14] This term is contained in Claim 17 of the '933 patent.

argues that the data accompanying a command in the second message type is specific to the command itself. Pltff's Brief at 21 ("command messages contain data that is specific to each message type."). Celltrace further contends that Defendants' proposed construction, when read in conjunction with Defendants' proposed construction for "cellular telephone," inappropriately limits Claim 17 of the '933 patent to a GSM network. *See* Dfts' Response at 25 (proposing that "cellular telephone" means "GSM-compatible cellular telephone").

Defendants respond with a variety of grammatical arguments.[15] First, Defendants contend that the '933 patent does not support Celltrace's construction because Claim 9 recites "a write command and associated write data." Dfts' Response at 28. According to Defendants, if the data were in fact specific to the command, as Celltrace contends, then "write" would not need to modify "data." *Id.* Second, the word "specific" is used in other portions of the '933 patent when the patentee meant "specific." *Id.* (pointing to Claim 14, which states "wherein the associated write data includes information relevant to a specific geographical area). Thus, it seems that Defendants contend that "specific" and "associated with" have different meanings and should be treated as such. *See id.*

First, the Court is disinclined to limit this claim term to a GSM network in light of the preamble of Claim 17 (the claim in which the term at issue is contained). The preamble limits the claim to a "telecommunications network," rather than a GSM-compatible telecommunications network," as claimed in the preamble of Claim 9. *Compare* '933 patent at 8:22, *with* '933 patent at

---

[15] Defendants include their response in a portion titled "No Construction Necessary Terms." Dfts' Response at 27. Therefore the Court assumes Defendants argue that no construction is necessary for the term "the first message type is formatted to contain text to be displayed on a display of the cellular telephone and the second message type is formatted to contain a command and data associated with the command."

7:28; *see also* discussion *infra* Section XI.

Second, "when construing terms in the body of a claim, the general assumption is that different terms have different meanings." *Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1289 (Fed. Cir. 2008). Because Claim 14 recites both "associated" and "specific," the terms are assumed to have different meanings. *See* '933 patent at 8:13-15. Moreover, the "associated with" language in contention is reiterated in Claim 1, and Celltrace did not raise the objections made here. *See* '933 patent at 6:49-53 ("an SMS write command message containing a write command and associated write data). Therefore, the Court presumes "associate with" and "specific" have different meanings.

Accordingly, the Court finds that no construction is necessary for the term "first message type is formatted to contain text to be displayed on a display of the cellular telephone and the second message type is formatted to contain a command and data associated with the command."

## VI. "short message service"[16]

| Term # | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| 7 | A service that allows delivery of messages of up to 160 characters in length to individual [cellular phones] or groups of [cellular phones] within a network. | A short message service is only a radio paging service and does not provide a service in which information can be transmitted from one station to another in response to a request signal from the latter station |

The parties' primary dispute is whether "short message service" in dispute refers to a version of Short Message Service ("SMS") particular to the 1993 Global System for Mobile

---

[16] This term is contained in Claim 12 of the '976 patent and Claims 17 and 20 of the '933 patent.

Communications ("GSM") networks. Celltrace contends that the term "SMS," is not the same as "short message service," stating that the lowercase term merely "refers to a generic service for sending short messages." PLTFF'S BRIEF AT 10. In support, Celltrace points to Claim 20:

> The network of claim 17, wherein the short message service protocol is an SMS protocol compliant with a GSM cellular telephony standard, and the short message service channel is compliant with a GSM cellular telephony standard.

'933 patent at 8:61-64 (Claim 20). Because Claim 20 further limits the short message service channel to one that is GSM compliant, *i.e.*, a Short Message Service,[17] Celltrace contends a short message service is a generic term to describe the delivery of short messages.

Defendants, on the other hand, contend that Celltrace is limited by the prosecution history, stating that Celltrace used the terms "short message service" and "SMS" interchangeably. DFTS' RESPONSE AT 16, n.23. According to Defendants, "short message service" was not part of the initial version of the '933 patent's Claim 17, and the amendments made to Claim 17 during prosecution were made to overcome prior art. *Id.* at 17. In particular, Defendants contend that to overcome an obviousness rejection in light of the Jokimies and John pieces of prior art, the patentee defined a short message service as a radio paging service: "a short message service, in essence, is only a radio paging service and does not provide a service in which information can be transmitted from one station to another in response to a request signal from the latter station." *Id.* at 21 (citing EX. 5, RESPONSIVE AMENDMENT, 09/11/98, AT CT790).

Celltrace argues that the prosecution history shows that the patentee only likened a short message service to an "advanced form of radiopaging." *See* PLTFF'S BRIEF AT 11. Therefore,

---

[17] SMS is considered specific to a GSM network. *See* DFTS' RESPONSE AT 20, 23.

according to Celltrace, when Defendants argue that the patent's prosecution history reflects a comparison between a short message service and an "advanced form of radiopaging," Celltrace did not actually attempt to define short message service as a radio paging service. *See id.* at 11.

Turning to the GSM argument, the Court finds that a short message service is different from a Short Message Service (SMS). *See Phillips*, 415 F.3d at 1315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."). Claim 20 provides additional limits on the "short message service" term expressed in Claim 17 of the '933 patent. By requiring that "the short message service protocol is an SMS protocol compliant with a GSM cellular telephony standard," a short message service is distinguished from a Short Message Service. *See* '933 patent at 8:61-64. Therefore, "short message service" is a generic term for a service that sends short messages, and the GSM/SMS limitation present in Claim 20 does not limit the term "short message service" recited in Claim 17.

As for Defendants' argument that Celltrace defined "short message service" as a radio paging service, the Court disagrees. The prosecution history of the '976 patent reflects a *characterization* of prior art, not a definition of the term "short message service." *See* Ex. 5, ATTACHED TO DFTS' RESPONSE, AT CT790. At issue were Claims 51 and 54, neither of which included a recitation of "short message service." *See* Ex. 5 AT CT781-82. Thus, the patentee did not use the term "short message service" to distinguish the invention from the prior art or to define the term itself. The patentee likely used the term to illustrate that the invention claimed in Jokimies was a handset operation involving either data message transmission or data message receiving, *like* a radio paging

service.[18]  Because the term "short message service" was not even at issue during the prosecution

of the '976 patent, the patentee did not define the term as a radio paging service.

Because Defendants do not directly dispute Celltrace's proposed construction, the Court finds

the term "short message service" means "a service that allows delivery of messages of up to 160

characters in length to individual cellular phones or groups of cellular phones within a network."

## VII.   "short message service channel"[19]

| Term # | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|--------|-----------------------------------|-----------------------------------|
| 8 | A channel over which short messages are sent and received. | a channel that (a) is particular to [short message service] and (b) is a control (as opposed to a traffic/voice) channel on which [short message service] data is received |

Defendants contend that the prosecution history of the '933 patent limits the "short message

service" to a GSM network where SMS messages are received only on the control channel and not

on a the traffic/voice channel.  DFTS' RESPONSE AT 19-20.  Celltrace counters by arguing that

nothing in the claims or the specification requires that 1) the short message service channel is

exclusive to short messages and nothing else or 2) that traffic/voice channels cannot carry short

messages.  PLTFF'S BRIEF AT 12.

Defendants are correct that the '933 patent's prosecution history prohibits Celltrace's broad

---

[18] The patentee characterized John as teaching "transmission of messages over the air from a host station to a mobile unit."  EX. 5, ATTACHED TO DFTS' RESPONSE, AT CT790.  The patentee then went on to describe Jokimies as disclosing "that a mobile telephone can transmit and receive data messages on a short message service basis, a short message service, in essence, is only a radio paging service and does not provide a service in which information can be transmitted from one station to another in response to a request signal from the latter station."  *Id.*

[19] This term is contained in Claims 17 and 20 of the '933 patent.

construction. Initially, the patent examiner rejected Claim 17 as unpatentable over Simpson in view of Vedder. EX. 6, ATTACHED TO DFTS' RESPONSE, AT CT1291. As to the first message type recited in Claim 17, the examiner relied upon Simpson for its disclosure of a GSM mobile phone and specifically for its teaching that "SMS is a data service wherein data is received on the control channel (as opposed to the traffic channel)." EX. 17, SIMPSON, ATTACHED TO DFTS' RESPONSE, AT 7:30-46. As to the second message type recited in Claim 17, the examiner relied upon Vedder for its disclosure of data that is transmitted over a traffic channel. Specifically, the examiner identified that Vedder stated, "[u]ser data is transferred over traffic channels as well as over signalling channels." EX. 18, VEDDER, SECURITY ASPECTS OF MOBILE COMMUNICATIONS § 2 (1991), ATTACHED TO DFTS' RESPONSE, AT CT8272. The patentee then amended Claim 17[20] to specify a "common messaging channel" to distinguish the invention from Simpson, which disclosed transmission of SMS messages (first message type) over a control/signalling channel, and Vedder, which taught transmission of command messages (second message type) over a traffic channel. *See* EX. 6, ATTACHED TO DFTS' RESPONSE, AT CT1314.

The examiner subsequently rejected Claim 17 for obviousness in light of the Cannon reference, which discloses:

> the first message type is formatted to contain text to be displayed on a display . . . and the second message type is formatted to contain a command and data associated with the command. . . [T]he message is wirelessly carried . . . using a common messaging protocol over a *common messaging channel*, regardless of whether the message is of the first or the second message type.

EX. 6, ATTACHED TO DFTS' RESPONSE, AT CT1345-46 (emphasis added). Thus, the Cannon

---

[20] Claim 17 of the '933 patent was numbered Claim 135 during prosecution. DFTS' RESPONSE AT 17, n.25.

reference disclosed sending two types of messages (data and control) over the same channel (*i.e.*, a common messaging channel) that carried packets having a signaling subframe for the data and control and a voice subframe. Celltrace amended Claim 17 to overcome the Cannon reference, changing the claim to "reflect a common short message messaging channel," *id.* at CT1372, which the examiner subsequently changed to "short message service." *Id.* at CT1441. In light of these changes, the examiner allowed the patent claim. *See id.* at CT 1442. Because Celltrace amended its claims to overcome the obviousness rejection—a rejection partly based on prior art describing two types of messages sent over a common voice channel—Celltrace's proposed construction is too inclusive; it allows short messages to be sent and received over a voice/traffic channel.

Defendants' construction distinguishes between two different types of channels (traffic/voice channel and control channel), reflecting the changes made in the '933 patent's prosecution history. Defendants correctly point to the amendment made to distinguish Cannon, which disclosed a voice channel used as a common channel to carry first and second message types (data and control).

Just as Celltrace's construction is overly broad, Defendants' proposed construction is too limiting. Defendants attempt to incorporate their construction for the term "short message service," which Defendants attempt to define as a radio paging service. For the reasons stated above, Defendants' construction for "short message service" is rejected. *See* discussion *supra* Section VI. Therefore, the term "short message service channel" is not limited to a radio paging service. Also, the term is not limited to "a channel that is particular to short message service." Defendants contend that such a limitation is required to distinguish over Vedder. However, the prosecution history only reflects that amendments were made as to the combination of Simpson and Vedder in regard to the claim recitations of first and second message types. Defendants' proposed construction would

exclude the usual signaling control information that is sent in addition to user data in the form of short messages.

Accordingly, the Court construes the term "short message service channel" as "a channel that is a control (as opposed to a traffic/voice) channel on which short message service data is received."

## VIII. "short message service protocol"[21]

| Term # | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|--------|-----------------------------------|-----------------------------------|
| 19 | a [protocol] that is used for [short message service] | a [protocol] that is particular to [short message service] |

The Court finds that no construction is necessary for the term "short message service protocol" in light of the construction for "short message service"[22] and "protocol."[23]

## IX. "GSM-compatible"[24]

| Term # | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|--------|-----------------------------------|-----------------------------------|
| 11 | Capable of functioning with GSM hardware or software. | meets all mandatory requirements of the GSM standard as of June 15, 1993 |

The primary dispute between the parties is the interpretation of "compatible." PLTFF'S BRIEF AT 14. Celltrace contends that the word should take on its ordinary and customary meaning. *Id.* According to Celltrace, something is "compatible" if it is capable of "function[ing] with hardware

---

[21] This term is contained in Claims 17 and 20 of the '933 patent.

[22] Term 7, construed above. *See* discussion *supra* Section VI.

[23] Term 2, construed below. *See* discussion *infra* Section XVII.

[24] This term is contained in Claims 1, 4, 5, 8, 9, and 10-14 of the '933 patent.

and/or software that is, in a practical sense, compliant with that [GSM] standard." *Id.* Celltrace further argues that Defendants' construction is overly limiting because it requires "compatible" to mean "meets all mandatory requirements." *Id.*

Defendants counter that the term should be given the meaning that "a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application," would interpret "GSM-compatible" to mean. DFTS' RESPONSE AT 22 (citing *Phillips*, 415 F.3d at 1312-13). In particular, Defendants contend that "GSM-compatible" refers to the GSM standard at the time the '933 patent was filed, the GSM standard as of June 15, 1993. *Id.* Defendants further argue that to refrain from referencing the 1993 GSM standard would make the claims indefinite. *Id.* at 23.

As an initial matter, "GSM-compatible" is not restricted to the GSM standard as of June 15, 1993. The term may include after-arising GSM standards. In *SuperGuide Corp. v. DirecTV Enterprises, Inc.*, the Federal Circuit examined whether a patent filed in 1985 could claim both analog and digital television signals when the "only type of television signals that were broadcast in 1985 were analog signals." 358 F.3d 870, 876-78 (Fed. Cir. 2004). In concluding that the patent did not preclude digital signals, the Federal Court stated that "[m]ethod and apparatus claims not written in means-plus-function format are not necessarily limited to that disclosed in the specification but rather by the language of the claims themselves." *Id.* at 878. Moreover, Federal Circuit case law does not prohibit "after-arising technology to be captured within the literal scope of valid claims that are drafted broadly enough." *Innogenetics N.V. v. Abbott Labs.*, 512 F.3d 1363, 1371-72 (Fed. Cir. 2008) (citing *SuperGuide*, 358 F.3d at 878-80).

In deciding *SuperGuide*, the Federal Circuit distinguished *KopyKake Enterprises, Inc. v.*

*Lucks Company*, where the court limited the patent in *KopyKake* to then-existing technologies. *SuperGuide*, 358 F.3d at 879 (citing *KopyKake*, 264 F.3d 1377 (Fed. Cir. 2001)). The claims in the *KopyKake* patent were self-limiting, reciting the "conventional" means of printing, which referred to the technology in existence at the time of filing. *See id.*

The claim language of the '933 patent is broad enough to include after-arising GSM standards because the patent does not recite any of the limitations found in the *KopyKake* patent. *See, e.g.,* '933 patent at 6:45 (Claim 1); 7:28 (Claim 9). The claims make no reference to "conventional means," nor do they contain language to indicate that the invention is limited to then-existing GSM standards. *See SuperGuide*, 358 F.3d at 879. Therefore, the language of the claims are sufficiently broad and may include after-arising GSM standards. Consequently, the term "GSM-compatible" is not limited to the GSM standards of 1993.

Turning now to the meaning of "compatible," the Court does not agree that it means "meets all mandatory requirements," as Defendants contend. First, the specification clearly states that the invention "is not limited to global systems and could be applied to a single national cellular network or even to a fixed land-linked network." '933 patent at 2:51-53. Therefore, the claims leave room for operation on non-GMS networks, and thus the invention need not meet all mandatory requirements of the GSM standard.

Second, dependent Claim 20 uses the term "compliant," rather than "compatible." Therefore, "compliant" and "compatible" are assumed to carry different meanings. *See Phillips*, 415 F.3d at 1315. Moreover, one of ordinary skill in the art would understand that "compatible" simply means an ability to function with existing hardware or software, and Celltrace provides numerous dictionary

definitions to that extent.[25]  "Compliant," on the other hand, is defined as "manufactured or produced in accordance with a specified body of rules (usually used in combination)."  *Compliant Definition*, Dictionary.com, http://dictionary.reference.com/browse/compliant (last visited Feb. 8, 2011).  As stated above, "the general assumption is that different terms have different meanings."  *Symantec*, 522 F.3d at 1289.  Because "compliant" essentially means "meets all mandatory requirements," as Defendants' construction proposes, "compatible" is assumed to mean something different.

Therefore, the Court finds that the proper construction of the term "GSM-compatible" is "capable of functioning with GSM hardware or software."

## X.    "a GSM cellular telephony standard"[26]

| Term # | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|--------|-----------------------------------|-----------------------------------|
| **12** | A publication that contains specifications related to the operation of GSM hardware or software. | the GSM standard as of June 15, 1993 |

Again, the parties dispute whether the term is limited to the GSM standard as of June 15, 1993.  *See* Dfts' Response at 22.  The Court will not limit the term "a GSM cellular telephony

---

[25] "**4.** *Computers*. **a.** (of software) capable of being run on another computer without change.  **b.** (of hardware) capable of being connected to another device without the use of special equipment or software.  **5.** *Electronics*. (of a device, signal, etc.) capable of being used with equipment in a system without need for special modification or conversion."  Webster's Encyclopedic Unabridged Dictionary of the English Language 417 (1996) (definition of "compatible").

"[Comput Sci] The ability of one device to accept data handled by another device without conversion of the data or modification of the code."  McGraw-Hill Dictionary of Scientific and Technical Terms 420 (5th ed. 1994) (definition of "compatibility").

"The degree to which a computer, an attached device, a data file, or a program can either work with or understand the same commands, formats, or language as another."  Computer Dictionary 73 (1991) (definition of "compatibility").

[26] This term is contained in Claim 20 of the '933 patent.

standard" to the GSM standard of 1993 for the reasons stated above. *See* discussion *supra* Section

IX. Celltrace, however, offers an "ordinary and customary meaning" of the word "standard."

PLTFF'S BRIEF AT 15. Specifically, a "standard" in the computing context is "a set of detailed

technical guidelines used as a means of establishing uniformity in an area of hardware or software

development." *Id.* at n.15 (citing HARTSELL DECL., EXH 8 ATTACHED TO PLTFF'S BRIEF).

Accordingly, the Court construes the term "a GSM cellular telephony standard" as "a publication that

contains specifications related to the operation of GSM hardware or software."

## XI. "cellular telephone"[27]

| Term # | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| 1 | *Plaintiff does not believe that a specific construction is necessary. However, to the extent the Court determines that a specific construction is warranted, Plaintiff proposes:* A device capable of wirelessly communicating with a cellular telecommunications network, including having a two-way voice conversation. | [GSM-compatible] cellular telephone[28] |

The issue in contention is whether the "cellular telephone" recited in the '933 patent must

be GSM-compatible. Defendants contend that the '933 patent claims, the Abstract, and the preferred

embodiment all require that the cellular telephone be GSM-compatible. DFTS' RESPONSE AT 25.

---

[27] This term is contained in Claims 1, 3, 4, 5, 8-13, 17, and 19 of the '933 patent.

[28] Defendants request that the Court construe the claimed cellular phone as a GSM-compatible cellular phone to the extent the claims do not already identify it as such.

Celltrace, on the other hand, argues that the term "cellular telephone" is well known, and therefore no construction is needed. PLTFF'S BRIEF AT 2-3. Celltrace further argues that Defendants' construction improperly imports limitations not recited in all claims; only certain claims specifically require a GSM-compatible cellular phone. *See id.* at 3.

Although the preambles of Claims 1 and 9 of the '933 patent recite GSM-compatibility, Claim 17 does not. *Compare* '933 patent at 6:45 ("GSM-compatible cellular telephone"), *with* '933 patent at 8:23-24 ("plurality of cellular telephones"). Thus, the '933 patent claims both "GSM-compatible cellular telephones" and "cellular telephones." Therefore, it is improper to extrapolate the GSM-compatible limitation to all cellular telephones recited in the '933 patent.

Because a "cellular telephone" is well-known, the Court finds no construction is required.

## XII. "SMS"[29]

| Term # | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| 20 | a short message service for sending messages over a telecommunications network in accordance with [protocols] originally promulgated in the GSM technical specifications | [a short message service for sending messages over a [GSM-compatible] telecommunications network |

At the claim construction hearing on November 2, 2010, the parties agreed to use Defendants' Proposed Construction for the term "SMS." Therefore, the Court construes the term "SMS" to mean "a short message service for sending messages over a GSM-compatible telecommunications network."

---

[29] This term is contained in Claims 1–3, 6-10, 12, 16, and 20 of the '933 patent.

## XIII.  "SIM card"[30]

| Term # | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| 9 | An integrated circuit card that (1) contains memory, (2) is designed to be inserted into and removed from a [cellular telephone], and (3) contains subscriber identity information. | a small self-contained microprocessor, held in a slot in a [GSM compatible] cellular telephone, that stores messages and then carries out write protect operations |

The main issue in dispute is whether the term "SIM card" refers to a component of a GSM cell phone that meets the requirements of the 1993 GSM standard.  Celltrace contends its proposed construction tracks the definition of "SIM card" given in the Background and Abstract sections of the '933 patent.  PLTFF'S BRIEF AT 12-13.  Defendants, on the other hand, argue that the term should take on the definition given in the specification, not the prior art definition given in the "Background of the Invention."  DFTS' RESPONSE AT 24-25.

The Abstract states that "each SIM card has fixed memory locations."  '933 patent Abstract. The "Background of the Invention" further describes SIM cards as "integrated circuit cards which can be releasably inserted into a mobile telephone and which contain in memory the subscriber's identity, *i.e.*, his telephone number."  '933 patent at 1:23-26.  Celltrace's definition mirrors these functions and capabilities: memory that contains subscriber identity information and a card to be inserted into a cellular telephone.  Thus, Celltrace's construction is correct.

As for Defendants' contention that "SIM card" needs to be defined in terms of GSM-compatibility, the Court finds that to do so would be redundant.  Independent claims 1 and 9—claims where the term is used—already limit the recited telecommunications network to a "GSM-

---

[30] This term is contained in Claims 1, 3, 5, 9, and 12 of the '933 patent.

compatible telecommunications network." *See* '933 patent at 6:44-64 (Claim 1); 7:28-50 (Claim 9). Consequently, there is no need to further limit "SIM card" in terms of GSM-compatibility.

Moreover, Defendants' proposed construction erroneously defines "SIM card" in terms of a preferred embodiment described within the specification. Defendants cite a portion of the specification that recites, "The mobile 6 recognizes the message as SMS data and passes it to a SIM card 7, which is a small self-contained microprocessor, held in a slot in the mobile 6. . . . The SIM card 7 of the invention stores the message in one of these locations, and then carries out a write protection operation." Dfts' Response at 24 (citing '933 patent at 3:36-47). However, this portion of the specification describes "the embodiment of the invention illustrated." '933 patent at 3:13-14. Thus, Defendants' construction is derived from a discussion of "the invention" in the context of the preferred embodiment illustrated in Figure 1. As such, there is an absence of support for departing from the description of the SIM card given in the "Background of the Invention."

Therefore, the Court finds that the proper construction of the term "SIM card" is "an integrated circuit card that (1) contains memory, (2) is designed to be inserted into and removed from a cellular telephone, and (3) contains subscriber identity information."

## XIV. "the cellular telephone distinguishes the message as being of either the first message type or the second message type"[31]

| Term # | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|--------|-----------------------------------|-----------------------------------|
|        |                                   |                                   |

---

[31] This term is contained in Claim 17 of the '933 patent.

| 4 | *Plaintiff does not believe that a specific construction is necessary. However, to the extent the Court determines that a specific construction is warranted, Plaintiff proposes:* The [cellular phone] determines that the message is either of the first message type or the second message type. | the [cellular telephone] contains a [SIM card] that distinguishes the message as being of either the first message type or the second message type |
|---|---|---|

The primary issue in contention is whether the cellular phone or the SIM card distinguishes between message types. *See* Dfts' Response at 25. Defendants contend that the SIM card distinguishes between the two types of messages, and therefore attempts to limit the claim term accordingly. *Id.* at 26. Defendants' conclusion rests on the assertions that 1) the '933 patent prosecution history and the specification only disclose one embodiment, an embodiment where the SIM card distinguishes between different message types; and 2) in its 1993 Great Britain priority applications, Celltrace "omitted approaches includ[ing] a non-SMS-based embodiment that used the cell phone to perform the distinguishing." *Id.*

Contrary to Defendants' proposal, Celltrace asserts that the phrase needs no construction because the plain language of the claim is easily understood. Pltff's Brief at 8. Celltrace directly refutes Defendants' construction, arguing that their construction improperly limits the phrase to a GSM network by incorporating Defendants' construction of "SIM card." *Id.* Celltrace further argues that the patentee included the SIM card limitation in the '933 patent when such a limit was intended to be applied, and therefore, Defendants' construction is tantamount to an attempt to rewrite Claim 17. *Id.* (comparing Claims 9 and 17 of the '933 patent).

First, Claim 17 of the '933 patent does not expressly limit this phrase to a GSM network. *See* '933 patent at 8:22-54 (Claim 17). As stated above, the preamble of Claim 17 does not limit the

claim to a GSM-compatible telecommunications network, unlike the preambles of Claims 1 and 9. *See* discussion *supra* Section V. Second, in the prosecution of the 1993 Great Britain priority applications, the patentee did not clearly disavow the use of non-SMS-based embodiments where the cellular telephone distinguished between the two message types. The patentee stated: "This approach is *less favourable* to the previous [SIM card distinguishing] example, as it would require a substantial change to the system design in order to implement." Ex. 5, PRIORITY APPLICATION, ATTACHED TO DFTS' RESPONSE, AT CT615 (emphasis added). A comment stating that a non-SMS-based approach may be less favorable does not amount to a clear disavowal of its use. Therefore, non-SMS/GSM-based embodiments of the invention are within the scope of the '933 patent.

In addition, Defendants ignore the disclosure of the SIM card as part of the cellular telephone structure. The specification of the '933 patent recites in relevant part:

> A recent innovation in such systems has been the introduction of the Subscriber Identity Modules (SIM cards). These are integrated circuit cards which *can be releasably inserted into a mobile telephone* and which contain in memory the subscriber's identity, i.e., his telephone number.

'933 patent at 1:22-26 (emphasis added). Thus, the SIM card is contained within the cellular telephone and the SIM card limitation is therefore redundant.

Accordingly, the Court finds the phrase at issue is easily understood and no construction is necessary for the term "the cellular telephone distinguishes the message as being of either the first message type or the second message type."

## XV. "means for distinguishing the formats of said first and second messages"[32]

---

[32] This term is contained in Claim 2 of the '976 patent.

| Term # | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **26**[33] | <u>Function</u>: [AGREED] distinguishing the formats of said first and second messages <br><br> <u>Structure</u>: a SIM card programmed to perform the algorithm disclosed in Figure 5 and equivalents thereof | <u>Function</u>: [AGREED] distinguishing the formats of the said first and second messages <br><br> <u>Structure</u>: filter 16 of SIM card 7*, programmed as set forth in element 9 of Figure 5 |

The main dispute between the parties concerns whether the SIM card or a filter in the SIM card distinguishes the message types. PLTFF'S BRIEF AT 27. Celltrace contends that the specification supports their contention that the SIM card determines whether the message has an Embedded Command Stream (ECS). *Id.* (citing '976 patent at 3:32-34). To bolster its argument, Celltrace turns to Figure 5, which shows that "in *the SIM card* '[a]t lozenge 9, messages, requests, and instructions having ECS are <u>distinguished</u> from those without." *Id.* (emphasis in original) (citing '976 patent at 5:15-16).

Defendants, however, argue that Celltrace's proposed structure does not include "special hardware and software" of the SIM card, which defies the stated object of the invention. DFTS' RESPONSE AT 29 (citing '976 patent at 1:35-36). Defendants contend that the corresponding structure linked to the function is "filter 16," a "specialized filter of SIM card 7." *Id.* (citing '976 patent at 4:56-58). Defendants further argue that the specification "discloses that programming for the 'distinguishing' step is set forth in lozenge 9 of Figure 5," *id.* at 29-30, because "[a]t lozenge 9, messages, requests and instructions having ECS are distinguished from those without." *Id.* at 30

---

[33] The joint claim construction chart submitted to the Court designates this term as Term 28. The parties designate this term as Term 26 in its Request Regarding Agreed Protocol for *Markman* Hearing (Doc. No. 228).

(citing '976 patent at 5:18-20). Therefore, Defendants argue, the corresponding structure is filter 16 programmed with instructions set forth in lozenge 9 of Figure 5.

As an initial matter, the parties agree that this term should be governed by 35 U.S.C. § 112 ¶6.[34] DFTS' RESPONSE AT 28, n.34. Therefore, the Court finds that § 112 ¶ 6 applies, and the Court will construe "means for distinguishing the formats of said first and second messages" as a means-plus-function term.

Next, the Court must determine the function claimed by the means-plus-function limitation. "The statute [35 U.S.C. § 112 ¶ 6] does not permit limitation of a means-plus-function claim by adopting a function different from that explicitly recited in the claim." *Micro Chemical, Inc. v. Great Plains Chemical Co., Inc.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999). Therefore, the function is "distinguishing the formats of said first and second messages."

Turning to the corresponding structure, the Court finds that the proper structure is a comparator and equivalents thereof. The specification, as pointed out by the parties, states that "[a]t lozenge 9, messages, requests, and instructions having ECS are distinguished from those without." '976 patent at 5:18-20; Fig. 5. Block 9 of Figure 5, which illustrates "the operation of the SIM card 7," is depicted below.

---

[34] The parties agree that the disputed terms of Claims 2-4, 10, and 17 of the '976 patent are means-plus-function terms. DFTS' RESPONSE AT 28, n.34.



Fig.5.

Fig.5(contd.)

'976 patent at 5:15-16; Fig.5.

A person of ordinary skill in the art would recognize the diamond-shaped flow chart symbol of lozenge 9 as a comparator, which performs a "Yes-No" decision structure. In this case, Block 9 compares the incoming SMS message to some standard to determine whether the message contains an Embedded Command Stream (ECS). Thus, one of ordinary skill in the art would recognize that the comparator, as part of "the SIM card 7, which uses [] specially fabricated hardware *and* software," executes the distinguishing function claimed in the means-plus-function term. *See* '976 patent at 5:15-17 (emphasis added). Therefore, the corresponding structure is a comparator and equivalents thereof.

Accordingly, the Court finds that the function for "means for distinguishing the formats of said first and second messages" is "distinguishing the formats of said first and second messages." The corresponding structure is a comparator and equivalents thereof.

**XVI.** **"first messages coded in a predetermined first format and second messages coded in a second format distinguished from said first format"**[35]

| Term # | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **10** | *Plaintiff does not believe that a specific construction is necessary. However, to the extent the Court determines that a specific construction is warranted, Plaintiff proposes*: A first message is coded in a predetermined first format and a second message is coded in a second format that is different than the first format. | [SMS] messages coded in a predetermined first format and other [SMS] messages coded in a second format distinguished from the first format |

The primary issue in dispute is whether the "'first message type' should be equated with an 'SMS message.'" PLTFF'S BRIEF AT 13. Celltrace simply argues that Defendants' construction imports extraneous limitations. *Id.* at 14. Defendants assert that the messages are limited to SMS messages because Celltrace stated that Claim 2 of the '976 patent was added "to protect the invention disclosed in Figure 5," which, according to Defendants, discloses only SMS message embodiments. DFTS' RESPONSE AT 16. Defendants further argue that Figure 5 cannot provide corresponding structure for many of the means-plus-function terms, as Celltrace contends, unless the messages are SMS messages. *Id.*

Defendants' construction is overly limiting. Nothing in Claim 2 of the '976 patent indicates that the claimed telecommunications system is limited to a GSM system, and to limit the messages to an SMS message would necessarily limit Claim 2 to a GSM network. Moreover, Defendants misconstrue the comments stating that Claim 2 was added to protect the embodiments disclosed in

---

[35] The term is contained in Claim 2 of the '976 patent.

Figure 5. None of the cited remarks indicate that the Figure 5 embodiment necessarily claims messages limited to a GSM network. For example, Defendants cite a comment the patentee made during prosecution, but the remark does not even mention SMS messages or a GSM network: "Claims 97-114, which issued as Claims 2-18, were added to 'more adequately protect the invention as disclosed with reference to Fig. 5 and the four primary command types, i.e., read, write, lock, attribute and run commands utilized therewith.'" DFTS' RESPONSE AT 16, n.24. Thus, the comments made during prosecution, at least those cited by Defendants, do not limit Claim 2 of the '976 patent to SMS messages.

Therefore, the Court finds that the plain language of the claim is easily understood and no construction is necessary for the term "first messages coded in a predetermined first format and second messages coded in a second format distinguished from said first format."

## XVII. "protocol"[36]

| Term # | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| 2 | A specific set of rules, procedures or conventions relating to the format of data transmitted between two devices. | A specific set of [GSM] rules, procedures or conventions relating to format and timing of data transmission between two devices. |

Although both sides essentially agree on a dictionary definition of the term "protocol," the parties are not in agreement as to whether the term must be limited to a GSM network. PLTFF'S BRIEF AT 4. Celltrace argues that a GSM limitation is extraneous, and points to Claim 20 of the '933

---

[36] This term is contained in Claims 17 and 20 of the '933 patent.

patent to show that "protocol" is different from an "SMS protocol compliant with a GSM cellular telephony standard." *Id.* at 5.

Defendants, however, contend that the only known "short message protocol" at the time the patent was filed was a GSM Short Message Service protocol in 1993 GSM networks. DFTS' RESPONSE AT 21. Defendants also state that the term "protocol" also requires a timing limitation because Celltrace admitted that "the timing of data transmissions instead would be found in a different type of protocol that deals with the actual radio frequency transmission channel." *Id.*

Claim 20 of the '933 patent distinguishes "protocol," as recited in Claim 17, from a "SMS protocol compliant with a GSM cellular telephony standard." *See* '933 patent at 8:62-64; *see also Phillips*, 415 F.3d at 1315; discussion *supra* SectionVI. Because Claim 17 does not explicitly recite a GSM limitation and the specification states that the claimed invention is operable on non-GSM networks, as well as GSM networks, the term "protocol" is not limited to a GSM network. *See* '933 patent at 45-52.

As for Defendants' timing argument, the Court finds that the timing limitation is vague and ambiguous. A protocol in the telecommunications context normally includes a message data format and rules for delivery of message data. However, the specification does not claim a specific protocol: "The specific protocol used for the transfer of information is not fixed and could be ISO7816 T=0 or any other suitable protocol." '933 patent at 5:50-52. Because the specification does not recite an explicit protocol, much less discuss any type of timing requirement, Defendants' construction is rejected.

Accordingly, the Court construes the term "protocol" as "a specific set of rules, procedures or conventions relating to the format of data transmitted between two devices."

## XVIII. "the cellular telephone is configured to receive and process messages of the first and the second message types"[37]

| Term # | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| 5 | *Plaintiff does not believe that a specific construction is necessary. However, to the extent the Court determines that a specific construction is warranted, Plaintiff proposes:* The [cellular telephone] is designed, structured and/or programmed to receive and process messages of the first and second types. | the [cellular telephone] contains a [SIM card] that can receive and process SMS messages in the first format and the second format |

The main issue in dispute is whether the SIM card, as opposed to the cellular telephone, receives and processes messages. DFTS' RESPONSE AT 26. The parties express the same arguments set forth in Section XIV. For the reasons set forth in Section XIV, the Court finds that no construction is required for the term "the cellular telephone is configured to receive and process messages of the first and the second message types."

## XIX. "prestored set of instructions"[38]

| Term # | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| 6 | *Plaintiff does not believe that a specific construction is necessary. However, to the extent the Court determines that a specific construction is warranted, Plaintiff proposes*: A group of prestored instructions that indicate a function or action to be taken. | a program stored in a [SIM card] |

---

[37] This term is contained in Claim 17 of the '933 patent.

[38] This term is contained in Claim 18 of the '933 patent.

The primary issue in dispute is whether the SIM card, as opposed to the cellular telephone, stores a set of instructions. *See* DFTS' RESPONSE AT 26. The parties reiterate the arguments set forth in Section XIV. For the reasons discussed in Section XIV, the Court finds no construction is necessary for the term "prestored set of instructions."

## XX. "remotely located information is downloaded"[39]

The parties have agreed that the term "remotely located information is downloaded" needs no construction.

## XXI. "means for detecting incoming said first and second messages"[40]

| Term # | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| 25[41] | Function: [AGREED] detecting incoming said first and second messages<br><br>Structure: a transceiver or mobile telephone and equivalents thereof | Function: [AGREED] detecting incoming said first and second messages<br><br>Structure: filter 16 of SIM card 7*, programmed as set forth in element 9 of Figure 5 |

The parties have agreed that the term "means for detecting incoming said first and second messages" should be construed as a means-plus-function term governed by § 112 ¶ 6. DFTS' RESPONSE AT 28, n.34. In addition, the parties have agreed that the function of the term is "detecting incoming said first and second messages." *Id.*

---

[39] This term is contained in Claim 17 of the '933 patent. The parties have designated this term as Term 22.

[40] This term is contained in Claim 2 of the '976 patent.

[41] The joint claim construction chart submitted to the Court designates this term as Term 27. The parties designate this term as Term 25 in its Request Regarding Agreed Protocol for *Markman* Hearing (Doc. No. 228).

The only remaining issue to resolve is the structure corresponding to the term's function. Defendants argue that filter 16 "detects any ECS messages from among the short messages received." DFTS' RESPONSE AT 29, n.36. In addition to the filter hardware, Defendants contend that the programming of element 9 of Figure 5 distinguishes messages containing ECS from those without. *Id.* at 29, n.38. Celltrace, on the other hand, asserts that the claim requires the cellular telephone, also known as a transceiver, to detect the incoming messages. PLTFF'S BRIEF AT 26 (citing '976 patent at 7:20-22 ("each said subscriber unit [*i.e.*, cellular telephone] having means for detecting incoming said first and second messages"); 3:21-23). Celltrace further argues that before the message information goes to the SIM card, the message must first pass through the cellular phone. *Id.*

The Court finds that the corresponding structure is a transceiver and equivalents thereof. The specification discloses that transceivers receive an SMS message and pass it on to the SIM card:

> Each cellsite 5 then broadcasts the message to a group of *transceivers or mobile telephones*, hereinafter referred to as "mobiles". . . . The *mobile 6 recognises the message* as SMS data and passes it to a SIM card 7.

'976 patent at 3:21-32 (emphasis added). By recognizing the message, the transceiver, or mobile, "detect[s] incoming said first and second messages." Therefore, the structure performing the recited function is a transceiver and equivalents thereof.

For the reasons stated above, the Court finds that the function for "means detecting incoming said first and second messages" is "detecting incoming said first and second messages." The structure linked to the function is a transceiver and equivalents thereof.

## XXII. "means connected to said distinguishing means for displaying messages distinguished as said first messages"[42]

| Term # | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **27**[43] | <u>Function</u>: [AGREED] displaying messages distinguished as said first messages<br><br><u>Structure</u>: a display attached to the transceiver or mobile telephone and equivalents thereof | <u>Function</u>: [AGREED] displaying messages distinguished as said first messages<br><br><u>Structure</u>: the display of GSM compatible* cellular phone 6 connected to filter 16 of SIM card 7* |

The parties agree that § 112 ¶ 6 applies, and therefore, the Court will construe the term "means connected to said distinguishing means for displaying messages distinguished as said first messages" as a means-plus-function term. The function, as agreed by the parties, is "displaying messages distinguished as said first messages."

The parties seem to agree that the corresponding structure is a display. PLTFF'S BRIEF AT 27. However, the parties dispute whether the structure contains the GSM limitation proposed by Defendants. *Id.* at 28; DFTS' RESPONSE AT 28, n.34. Because displaying the message does not depend on the type of network on which the mobile telephone operates, the GSM limitation is extraneous. Therefore, the Court finds that the corresponding structure linked to the recited function is a display and equivalents thereof.

Consequently, the function of the term is "displaying messages distinguished as said first messages," and the corresponding structure is a display and equivalents thereof.

---

[42] This term is contained in Claim 2 of the '976 patent.

[43] The joint claim construction chart submitted to the Court designates this term as Term 29. The parties designate this term as Term 27 in its Request Regarding Agreed Protocol for *Markman* Hearing (Doc. No. 228).

## XXIII. "means responsive to said commands of said second messages to determine and undertake appropriate processing of the data contained in said second messages"[44]

| Term # | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **28**[45] | Function: [AGREED] responsive to said commands of said second messages to determine and undertake appropriate processing of the data contained in said second messages<br><br>Structure: a SIM card programmed to perform the algorithm disclosed in Figure 5 and equivalents thereof | Function: [AGREED] responsive to said commands of said second messages to determine and undertake appropriate processing of the data contained in said second messages<br><br>Structure: a CPU of SIM card 7* programmed as set forth in paths 11-14 of Figure 5 |

The Court finds the term falls under § 112 ¶ 6 and will construe the term as a means-plus-function term. The recited function is "responsive to said commands of said second messages to determine and undertake appropriate processing of the data contained in said second messages."

The parties disagree whether the SIM card performs the function or a specific component of the SIM card, namely the CPU, performs the recited function. PLTFF'S BRIEF AT 28. Celltrace contends that the operations described in Figure 5, *i.e.* Paths 11-14, describe the function recited in the claim. *See id.* at 26, 28. Celltrace asserts that because Figure 5 "is a flowchart illustrating the operation of the SIM card 7," the SIM card is the structure linked to the recited function. *Id.* (citing '976 patent at 5:15)

Defendants respond that the CPU of the SIM card carries out the operations of Paths 11-14 illustrated in Figure 5. *See* DFTS' RESPONSE AT 30. Presumably, Defendants contend that the

---

[44] This term is contained in Claim 2 of the '976 patent.

[45] The joint claim construction chart submitted to the Court designates this term as Term 30. The parties designate this term as Term 28 in its Request Regarding Agreed Protocol for *Markman* Hearing (Doc. No. 228).

electronic structure of the SIM card 7—the CPU— executes the operations described in Paths 11-14 of Figure 5. *See id.*

Looking to Figure 5 of the '976 patent, the Court finds that the corresponding structure is a comparator and equivalents thereof:



The flowchart indicates that only the comparator blocks at the head of Paths 11-14 are responsive to the commands: "The command and data types are decoded at box 10 and *acted* on in one of the four paths 11-14." '976 patent at 5:26-40 (emphasis added); Fig. 5. Once the command is decoded, the comparator blocks determine whether a command is a write, read, attribute or run command. '976 patent at Fig. 5. Upon determination of the command type, the comparator provides an output directing the appropriate processing action to be taken. '976 patent at Fig. 5. Essentially, the comparator is "responsive to said commands of said second messages to determine and undertake appropriate processing of the data contained in said second messages."

Accordingly, the function of the term "means responsive to said commands of said second messages to determine and undertake appropriate processing of the data contained in said second messages" is "responsive to said commands of said second messages to determine and undertake appropriate processing of the data contained in said second messages," and the corresponding structure is a comparator and equivalents thereof.

## XXIV. "access means enabling said memory locations thereof to be selectively accessed, when required, to fetch from a selected said memory location data stored therein"[46]

| Term # | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **29**[47] | Function: [AGREED] enabling said memory locations thereof to be selectively accessed, when required, to fetch from a selected said memory location data stored therein<br><br>Structure: a SIM card programmed to perform the algorithm disclosed in Figure 5 and equivalents thereof | Function: [AGREED] enabling said memory locations thereof to be selectively accessed, when required, to fetch from a selected said memory location data stored therein<br><br>Structure: E2ROM 17 of SIM card 7* organized as set forth in Figure 4 |

The parties agree that the term "access means enabling said memory locations thereof to be selectively accessed, when required, to fetch from a selected said memory location data stored therein" should be treated as a means-plus-function term. The parties further agree that the function is "enabling said memory locations thereof to be selectively accessed, when required, to fetch from a selected said memory location data stored therein."

---

[46] This term is contained in Claim 3 of the '976 patent.

[47] The joint claim construction chart submitted to the Court designates this term as Term 31. The parties designate this term as Term 29 in its Request Regarding Agreed Protocol for *Markman* Hearing (Doc. No. 228).

However, the parties dispute whether the structure linked to the function is the SIM card or the E2ROM 17 of the SIM card 7.  *See* Pltff's Brief at 28-29.  Celltrace argues that the structure must be able to "access[] memory locations to retreive data contained therein."  *Id.* at 29.  According to Celltrace, the specification provides that the SIM card accesses said data, as shown in Path 12 of Figure 5.  *Id.* (citing '976 patent at 5:29-35).  Celltrace further argues that the E2ROM is read-only memory, and there is no indication that the E2ROM can access itself to retrieve data.  *Id.*

Defendants, on the other hand, contend that the E2ROM 17 contained within the SIM card accesses and fetches data.  Dfts' Response at 30.  Defendants argue that the specification supports their construction: "The ECS messages are sent directly to an extended erasable read only memory (E$^2$ROM) 17, which is preferably a 'flash' E$^2$ROM.  Data can also be output from the E$^2$ROM directly to the I/O manager 15."  *Id.* at 30, n.49 (citing '976 patent at 4:52-61).

It is important to note that the function is "enabling . . . memory locations . . . to be selectively accessed."  The specification states that to access a corresponding memory location a subscriber may punch in a code using a key pad on a cell phone:

> The subscriber, remembering that the car hire company's number is in location 01 as shown at 8, *keys in a short code corresponding to the location*, such as 01#.  The mobile 6 then interrogates the SIM card 7 to retrieve the telephone number from the location.  The SIM card 7 provides both the number and the alphanumeric tag giving the company's name and displays it to the subscriber.  The user confirms that he wishes to proceed by pressing SEND.

'976 patent at 3:46-55 (emphasis added).  The code punched in on the mobile keypad initiates a process that eventually accesses and fetches data from the memory locations.  Thus, the keypad of the cell phone "enabl[es] said memory locations . . . to be selectively accessed, when required, to fetch from a selected said memory location data stored therein."

Moreover, Claim 7, which depends on Claim 3, a dependent claim of Claim 2, recites, "the entry of a selected said short code by said access means to fetch said data from a corresponding said memory location." '976 patent at 7:51-53. Using a keypad of a cell phone to enter such code is described in the portion of the specification recited above.

Therefore, the corresponding structure that performs the function "enabling said memory locations thereof to be selectively accessed, when required, to fetch from a selected said memory location data stored therein," is a keypad of a cell phone and equivalents thereof.

## XXV. "means to present information corresponding to data fetched from a selected said memory location to a user of said subscriber unit"[48]

| Term # | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **30**[49] | Function: [AGREED] to present information corresponding to data fetched from a selected said memory location to a user of said subscriber unit<br><br>Structure: a display attached to the transceiver or mobile telephone and equivalents thereof | Function: [AGREED] to present information corresponding to data fetched from a selected said memory location to a user of said subscriber unit<br><br>Structure: the display of GSM compatible* cellular phone 6 |

The Court finds § 112 ¶ 6 applies, and will construe the term "means to present information corresponding to data fetched from a selected said memory location to a user of a said subscriber unit" as a means-plus-function term. The function, as recited by the claim, is "to present information corresponding to data fetched from a selected said memory location to a user of said subscriber unit."

---

[48] This term is contained in Claim 4 of the '976 patent.

[49] The joint claim construction chart submitted to the Court designates this term as Term 32. The parties designate this term as Term 30 in its Request Regarding Agreed Protocol for *Markman* Hearing (Doc. No. 228).

The parties' dispute whether the structure is a display of a GSM-compatible cell phone, as opposed to a display of a cell phone or transceiver. PLTFF'S BRIEF AT 29. Celltrace argues that the structure is not limited to a GSM-compatible cellular phone, and reiterates the arguments set forth in Sections XI and XV. *See id.* (citing PLTFF'S BRIEF AT 2-4, 27). Defendants agree that the structure is a display of a cellular phone, but argue that the structure must be GSM-compatible. DFTS' RESPONSE AT 28, n.34.

The parties agree that the corresponding structure is a display. Therefore, the Court finds that the proper structure is a display and equivalents thereof. The structure need only perform the function, which is to present information to a user. Whether the mobile 6 displaying the information is GSM-compatible is of no consequence to the performance of the function, and therefore, Defendants' construction is overly limiting.

Accordingly, the function of "means to present information corresponding to data fetched from a selected said memory location to a user of said subscriber unit" is "to present information corresponding to data fetched from a selected said memory location to a user of said subscriber unit." The structure linked to the recited function is a display and equivalents thereof.

## XXVI. "means for transmitting data fetched from a selected said memory location to said host station"[50]

| Term # | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | | |

---

[50] This term is contained in Claim 4 of the '976 patent.

| | | |
|---|---|---|
| **31**[51] | <u>Function</u>: [AGREED] transmitting data fetched from a selected said memory location to said host station<br><br><u>Structure</u>: the transceiver or mobile telephone and equivalents thereof | <u>Function</u>: [AGREED] transmitting data fetched from a selected said memory location to said host station<br><br><u>Structure</u>: a CPU of SIM card 7* programmed as set forth in path 12 of Figure 5 |

The parties agree that the term falls under § 112 ¶ 6, and the Court will therefore construe the term as a means-plus-function term. In addition, the parties agree that the function is "transmitting data fetched from a selected said memory location to said host station."

Celltrace argues that the corresponding structure is the mobile telephone because the specification links the mobile telephone as the structure performing the "transmitting" function. PLTFF'S BRIEF AT 29. Celltrace further contends that Defendants' construction erroneously names the CPU of the SIM card as the structure. *Id.*

The specification links the cell phone, or transceiver, to the transmission of data. "The SIM card 7 supplies the information and the mobile uses existing voice/data techniques to transmit the information to the company." '976 patent at 4:6-8. The specification also refers to a mobile as a transceiver: "Each cellsite 5 then broadcasts the message to a group of transceivers or mobile telephones, hereinafter referred to as 'mobiles.'" '976 patent at 21-23. Therefore, the structure that transmit[s] data fetched from a selected said memory location to said host station" is a transceiver.

Accordingly, the corresponding structure is a transceiver and equivalents thereof.

---

[51] The joint claim construction chart submitted to the Court designates this term as Term 33. The parties designate this term as Term 31 in its Request Regarding Agreed Protocol for *Markman* Hearing (Doc. No. 228).

**XXVII. "wherein . . . said access means is only able to fetch data from a selected said secure memory location in response to entry of a personal identification signal"[52]**

| Term # | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **32**[53] | Function: [AGREED] only being able to fetch data from a selected said secure memory location in response to entry of a personal identification signal<br><br>Structure: a SIM card programmed to perform the algorithm disclosed in Figure 5 and equivalents thereof | Function: [AGREED] only being able to fetch data from a selected said secure memory location in response to entry of a personal identification signal<br><br>Structure: E2ROM 17 of SIM card 7* organized as set forth in Figure 4 |

The Court finds that no construction is needed for the term " wherein . . . said access means is only able to fetch data from a selected said secure memory location in response to entry of a personal identification signal" in light of the construction of "access means."[54]

**XXVIII. "means for transmitting said second messages simultaneously to more than one of said subscriber units via cell broadcasting"[55]**

| Term # | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | | |

---

[52] This term is contained within Claim 10 of the '976 patent.

[53] The joint claim construction chart submitted to the Court designates this term as Term 34. The parties designate this term as Term 32 in its Request Regarding Agreed Protocol for *Markman* Hearing (Doc. No. 228).

[54] Term 29, construed above. *See* discussion *supra* Section XXIV.

[55] This term is contained in Claim 17 of the '976 patent.

| 33[56] | Function: [AGREED] transmitting said second messages simultaneously to more than one of said subscriber units via cell broadcasting

Structure: base transceiver stations or cellsites and equivalents thereof | Function: [AGREED] transmitting said second messages simultaneously to more than one of said subscriber units via cell broadcasting

Structure: a base transceiver station of a GSM-compatible* telecommunications Network |

The Court finds that the term "means for transmitting said second messages simultaneously to more than one of said subscriber units via cell broadcasting" is a means-plus-function term. The function is "transmitting said second messages simultaneously to more than one of said subscriber units via cell broadcasting."

The parties agree that the structure that performs the function is a base transceiver station. Celltrace contends that cellsites should also be included as structure because they too transmit messages, as stated in the specification. PLTFF'S BRIEF AT 30 (citing '976 patent at 3:21). Further, Celltrace argues that the specification treats the terms "cellsite" and "base transceiver stations" as synonyms. *Id.* Defendants, however, contend that the base transceiver stations must be GSM-compatible because the claims require SMS messages, which necessarily implicates a GSM network. DFTS' RESPONSE AT 28, n.34.

Celltrace is correct that the specification treats base transceiver stations as the equivalent of a cellsite: "the cellsites 5 are base transceiver stations of the GSM network." '976 patent at 3:19-20. In addition, "[e]ach cellsite 5 . . . broadcasts the message to a group of transceivers or mobile

[56] The joint claim construction chart submitted to the Court designates this term as Term 35. The parties designate this term as Term 33 in its Request Regarding Agreed Protocol for *Markman* Hearing (Doc. No. 228).

telephones." '976 patent at 3:21-22. Therefore, the corresponding structure is a base transceiver station or cellsite, and equivalents thereof.

Accordingly, the Court finds that the structure performing the function "transmitting said second messages simultaneously to more than one of said subscriber units via cell broadcasting" is a base transceiver station or cellsite, and equivalents thereof.

## CONCLUSION

For the foregoing reasons, the court adopts the constructions set forth above.

**So ORDERED and SIGNED this 23rd day of February, 2011.**

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE